# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MANIILAQ ASSOCIATION** <br> 733 2nd Avenue <br> (P.O. Box 256) <br> Kotzebue, AK  99752 <br><br> PLAINTIFF, <br><br> v. <br><br> **UNITED STATES OF AMERICA;** <br><br> **KATHLEEN SEBELIUS**, in her official capacity as Secretary, <br> U.S. Department of Health & Human Services <br> 200 Independence Ave, S.W. <br> Washington, DC 20201 <br><br> **YVETTE ROUBIDEAUX**, in her official capacity as Director, <br> Indian Health Service <br> 801 Thompson Avenue, Ste. 400 <br> Rockville, MD 20852-1627 <br><br> DEFENDANTS. | <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br> Civil Action No. 1:13-cv-00426 <br><br><br> **COMPLAINT** <br><br><br> |

Served:     The Honorable Eric H. Holder, Jr.
            Attorney General of the United States
            U.S. Department of Justice
            950 Pennsylvania Avenue, NW
            Washington, D.C.   20530-0001

            The Honorable Ronald C. Machen, Jr.
            United States Attorney for the District of Columbia
            Judiciary Center Building
            555 Fourth Street, NW
            Washington, D.C.   20530

## COMPLAINT

The Plaintiff, for its cause of action against the Defendants named above, alleges as follows:

## INTRODUCTION AND SUMMARY

1. This is a suit against the United States for breach of contract and statute by the Indian Health Service ("IHS"), an agency in the Department of Health and Human Services ("HHS"). Plaintiff, the Maniilaq Association ("Maniilaq"), seeks money damages under the Contract Disputes Act, 41 U.S.C. § 7101 *et seq*. ("CDA"), based on the Secretary's repeated violations of Maniilaq's contractual and statutory right to the payment of full funding of contract support costs ("CSC") for contracts entered under the Indian Self-Determination and Education Assistance Act ("ISDEAA"), Pub. L. No. 93-638, as amended, 25 U.S.C. § 450 *et seq*.

2. Defendants breached Maniilaq's contracts by failing to pay the full CSC owed to Maniilaq under the ISDEAA and Maniilaq's contracts and annual funding agreements ("AFAs") for fiscal years 2006 through 2011.

3. Defendants paid only a portion of the CSC owed under Maniilaq's contracts, due to their misapplication of federal contracting and appropriations law. In the appropriations acts each year, Congress imposed "caps" on aggregate CSC spending, which Defendants believed allowed them to underfund Maniilaq's contracts. This resulted in CSC "shortfalls," which the IHS calculated for each of the fiscal years from 2006 to 2011 and reported to Congress.

4. The Supreme Court found Defendants' practice unlawful, holding that the IHS is responsible for fully funding ISDEAA contracts—including all of the required CSC—without regard to congressionally instituted caps on CSC funding as a whole. *Salazar v. Ramah Navajo Chapter*, 567 U.S. ___, 132 S. Ct. 2181 (2012). As long as there are sufficient appropriations to

cover an individual contract's costs—even if there is not enough to fully fund all contracts—the Government's obligation to fully pay each individual contract remains. In the Court's words, "The agency's allocation choices do not affect the Government's liability in the event of an underpayment." *Ramah*, 132 S. Ct. at 2192, quoting *Cherokee Nation of Okla. v. Leavitt*, 543 U.S. 631, 641 (2005).

5. Maniilaq's claims are indistinguishable from those in *Ramah*. The IHS received sufficient funds in each year at issue to fully pay Maniilaq's CSC, although Congress limited the aggregate amount of funding for all CSC at the agency. The shortfall in CSC owed to Maniilaq is a result of the agency's allocation choices, but the Government remains liable for payment of the full amount, plus additional damages arising from the failure to pay the full amount.

## JURISDICTION AND VENUE

6. This controversy arises under agreements between the United States and Maniilaq for operation of Indian health programs carried out pursuant to ISDEAA contracts and funding agreements. This Court has subject matter jurisdiction under the CDA, 41 U.S.C. § 7104(b), and the ISDEAA. *See* 25 U.S.C. § 450m-1(a) (providing original jurisdiction to United States district courts, concurrent with the Court of Federal Claims, over civil actions for money damages arising under ISDEAA contracts).

7. In August of 2011, Maniilaq requested an IHS contracting officer's decision on claims for underpaid CSC for the fiscal years 2006, 2007, and 2008. Maniilaq has received no response from the IHS on any of these letters. The IHS has not issued a decision on these claims within a reasonable time, so they are deemed denied. 41 U.S.C. § 7103(f)(5). On September 25, 2012, Maniilaq further requested a contracting officer's decision on claims for underpaid CSC for fiscal years 2009, 2010, and 2011. Maniilaq has received no decision from the IHS on these

claims within a reasonable time, so they are also deemed denied. *Id.* Accordingly, Maniilaq has exhausted its administrative remedies, as required by the CDA. 41 U.S.C. § 7104(b).

8. This Court has jurisdiction to review the IHS's decisions denying Maniilaq's claims for fiscal years 2006-2011 under the CDA and Section 110 of the ISDEAA. 41 U.S.C. § 7104(b); 25 U.S.C. § 450m-1(a); 25 U.S.C. § 450m-1(d).

9. Venue is proper because Defendant Kathleen Sebelius in her official capacity as Secretary of HHS is located in the District of Columbia.

## PARTIES

10. Plaintiff Maniilaq is a non-profit organization representing twelve federally recognized tribes in northwest Alaska. Maniilaq also operates Maniilaq Health Services, which manages and maintains medical, clinical, and nursing services among eleven village clinics and the Maniilaq Health Center in Kotzebue. Maniilaq Health Services provides comprehensive health care for all residents of the Northwest Alaska region. Maniilaq has contracted with the IHS under the ISDEAA to carry out these functions.

11. Defendant United States is a party to every ISDEAA contract, including Maniilaq's. 25 U.S.C. § 450*l*(c), Model Agreement § 1(a)(1); Alaska Tribal Health Compact between Certain Alaska Native Tribes and the United States of America (amended and restated Oct. 1, 2006).

12. Defendant Kathleen Sebelius is the Secretary of Health and Human Services, and is charged by law with the responsibility for implementing the ISDEAA, and other health laws benefiting Indians, on behalf of the United States. 25 U.S.C. § 450f(a)(1); 25 U.S.C. § 450b(i); 42 U.S.C. § 2001. Defendant Sebelius is sued in her official capacity.

13.     Defendant Yvette Roubideaux is the Director of the IHS, the primary agency that carries out HHS's responsibility for implementing the ISDEAA, and other health laws benefiting Indians, on behalf of the United States.  *See* 25 U.S.C. § 1661.  Defendant Roubideaux is sued in her official capacity.

## STATEMENT OF FACTS

### The ISDEAA

14.     During all of the years at issue in this appeal, fiscal years 2006-2011, Maniilaq provided health care services to eligible Indians and other eligible beneficiaries pursuant to agreements entered into with the Secretary of the HHS and the IHS under Title V of the ISDEAA, 25 U.S.C. § 458aaa *et seq*.

15.     The ISDEAA authorizes Maniilaq, other tribal organizations, and tribes to assume responsibility to provide programs, functions, services and activities ("PFSAs") that the Secretary would otherwise be obligated to provide.  In return, the Secretary must provide Maniilaq two types of funding under Section 106(a) of the ISDEAA: (1) "program" funds, the amount the Secretary would have provided for the PFSAs had the IHS retained responsibility for them, *see* 25 U.S.C. § 450j-1(a)(1), sometimes called the "Secretarial amount" or the "106(a)(1) amount"; and (2) "contract support costs," the reasonable administrative and overhead costs associated with carrying out the PFSAs, *see* 25 U.S.C. § 450j-1(a)(2) and (3).[1]  *See also* 25 U.S.C. § 458aaa-15(a) (Title V

---

[1] Section 106(a)(2) of the ISDEAA mandates as follows:

> (2)     There shall be added [to the 106(a)(1) amount] contract support costs which shall consist of an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management, but which—
>       (A) normally are not carried on by the respective Secretary in his direct operation of the program; or

provision stating that "[a]ll provisions of sections . . . 450j-1(a) through (k) . . . of [Title 25 U.S.C.] . . . shall apply to compacts and funding agreements authorized by this part").

16. There are three types of CSC: (1) start-up costs, which are one-time costs to plan, prepare for and assume operation of a new or expanded PFSA, *see* 25 U.S.C. § 450j-1(a)(5) & (6); (2) indirect costs, costs incurred for a common or joint purpose benefiting more than one PFSA, such as administrative and overhead costs, *see* 25 U.S.C. § 450j-1(a)(2); and (3) direct CSC ("DCSC"), expenses directly attributable to a certain PFSA but not captured in either the indirect cost pool or the 106(a)(1) amount, such as workers compensation insurance or other expenses the Secretary would not have incurred because, for example, the Government is self-insured, *see id*. 25 U.S.C. § 450j-1(a)(3)(A).

17. The ISDEAA requires that, upon approval of the contract, "the Secretary <u>shall add to the contract the full amount of funds</u> to which the contractor is entitled [under section 106(a) of the ISDEAA]," including CSC. 25 U.S.C. § 450j-1(g) (emphasis added); *see also Cherokee Nation*, 543 U.S. at 634 ("The [ISDEAA] specifies that the Government must pay a tribe's costs, including administrative expenses."). As noted above, one component of the required CSC under section 106(a) is indirect cost funding, which covers administrative and overhead costs, allowing all program funds to be used to provide health care PFSAs for tribal members and other beneficiaries.

18. For Maniilaq, the "full amount" of indirect costs was (and is) determined by multiplying a negotiated indirect cost rate by the amount of the direct cost base. Maniilaq's indirect cost rate, direct cost base, resulting indirect cost requirement, and any shortfall in funding

---

(B) are provided by the Secretary in support of the contracted program from resources other than those under contract.

25 U.S.C. § 450j-1(a)(2).

were memorialized in the CSC "shortfall reports" IHS prepared for Congress each year in accordance with the ISDEAA, as discussed further below.  *See* 25 U.S.C. § 450j-1(c).

### The CSC Shortfalls and the *Ramah* Case

19. Despite the ISDEAA's requirements that the Secretary shall pay the full amount of CSC, the IHS has not done so.  Since at least fiscal year 1993, IHS has underpaid the vast majority of ISDEAA contractors, as documented in the agency's annual CSC "shortfall reports" to Congress.  IHS prepares the shortfall reports in compliance with ISDEAA section 106(c), which requires that the agency submit to Congress an annual report on the implementation of the ISDEAA, including:

> (1) an accounting of the total amounts of funds provided for each program and the budget activity for direct program costs and contract support costs of tribal organizations under self-determination;
> (2) an accounting of any deficiency in funds needed to provide required contract support costs to all contractors for the fiscal year for which the report is being submitted . . . .

25 U.S.C. § 450j-1(c).  Each IHS Area Office, including the Alaska Area (where Maniilaq is located), prepares a shortfall report that shows how much each tribe and tribal organization in the Area was paid in CSC for the fiscal year, how much IHS would have paid had Congress appropriated sufficient CSC funding to pay every ISDEAA contractor in full, and the resulting shortfall.  The reports reflect the data in the contracts, funding agreements, and indirect cost rate agreements of tribal contractors.

20. Though the form of the shortfall reports has varied somewhat over the years, the essential information in the reports used to calculate the shortfalls has remained the same: the total CSC requirement minus the actual CSC paid by the IHS equals the CSC shortfall, which is reported to Congress.

21.     Prior to fiscal year 1998, Congress imposed no statutory restriction on availability of CSC, but IHS limited its payment to the amounts recommended in congressional committee reports.  In 2005, the U.S. Supreme Court held this practice unlawful, ruling that the appropriations available to pay tribes the full CSC due under section 106(a) and their contracts included the IHS's entire unrestricted lump-sum appropriation. *Cherokee Nation*, 543 U.S. at 642-43 (2005).  The Court held that IHS should have reprogrammed funds to pay the Cherokee Nation the full CSC due under its contracts.

22.     Despite the *Cherokee* ruling, Defendants continued their practice of paying less than full CSC to ISDEAA contractors. Defendants justified the systematic underpayment of CSC by pointing to the CSC spending "caps" Congress has placed in the appropriations acts beginning in fiscal year 1998. *See, e.g.*, Omnibus Consolidated and Emergency Supplemental Appropriations Act of 1999, Pub. L. No. 105-277, 112 Stat. 2681, 2681–279 (1998) ("not to exceed $203,781,000 shall be for payments to tribes and tribal organizations for contract or grant support costs associated with [ISDEAA] contracts").

23.     In 2012, the U.S. Supreme Court considered the Government's responsibility to fully fund CSC during years when Congress placed a cap on the amount of funding available for CSC.  Echoing its reasoning in *Cherokee*, the Court held that—even if Congress appropriates insufficient funds to cover the aggregate amount due to every contractor, but enough to pay any individual contractor's CSC—the Government is obligated to pay each contractor's CSC in full. *Ramah*, 132 S. Ct. at 2186.[2]

---

[2] "Once Congress has appropriated sufficient legally unrestricted funds to pay the contracts at issue, the Government normally cannot back out of a promise to pay on grounds of 'insufficient appropriations,' even if the contract uses language such as 'subject to the availability of appropriations,' and even if an agency's total lump-sum appropriation is insufficient to pay *all* the contracts the agency has made." *Ramah*, 132 S. Ct. at 2190 (internal quotations omitted) (emphasis in the original).

24. The Court explicitly rejected arguments that the government is not liable for full CSC because Congress did not appropriate sufficient funding for all CSC, and that the ISDEAA states that the Secretary "is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe." *Ramah*, 132 S. Ct. at 2192, quoting 25 U.S.C. § 450j-1(b). The Court found this idea was "inconsistent with ordinary principles of Government contracting law," and that the "agency's allocation choices do not affect the Government's liability in the event of an underpayment." *Id.*[3]

25. Maniilaq was one of the tribal contractors underpaid in FYs 2006-2011 as a result of IHS's allocation choices. According to the agency's own CSC shortfall reports, Maniilaq suffered significant CSC underpayments in fiscal years 2006-2011. The shortfalls documented in the reports for those years are summarized in the following table:

**Table 1.  Shortfall Summary**

| Year | Total Requirement ($) | Total Paid ($) | Shortfall ($) |
|---|---|---|---|
| 2006 | 12,234,254 | 9,961,983 | 2,272,271 |
| 2007 | 15,088,255 | 10,028,210 | 5,060,045 |
| 2008 | 15,125,547 | 9,935,947 | 5,189,600 |
| 2009 | 15,417,689 | 10,264,942 | 5,152,747 |
| 2010 | 15,919,131 | 13,306,632 | 2,612,499 |
| 2011 | 15,930,466 | 13,357,383 | 2,573,083 |
| TOTAL | | | **22,860,245** |

26. The amounts of Maniilaq's claims for 2006, 2007, and 2008 are based on the data summarized in the IHS shortfall reports. Maniilaq's claims for 2009, 2010, and 2011 include

---

[3] The *Ramah* decision concerned CSC from the Bureau of Indian Affairs, but after that decision, the Court vacated a Federal Circuit case involving the IHS that had reached a contrary conclusion. On remand, the Federal Circuit followed *Ramah*, noting the IHS appropriations were limited by identical language as the BIA appropriations in *Ramah*, and holding the Secretary was obligated to pay all of the tribal contractor's CSC. *Arctic Slope Native Ass'n, Ltd. v. Sebelius*, 2012 WL 3599217, No. 2010-1013 (Fed. Cir., Aug 22, 2012) *on remand from Arctic Slope Native Ass'n., Ltd. v. Sebelius*, 133 S. Ct. 22 (2012), *vacating* 629 F.3d 1296 (Fed. Cir. 2010).

"shortfall claims" in the amounts reported for those years, but also additional claims described below.

### IPA/MOA Conversions

27.     Maniilaq carries out its Compact and AFA in part through federal employees provided under Intergovernmental Personnel Act ("IPA") Memoranda of Agreement ("MOA"). However, IHS failed to pay direct CSC on the salaries of these employees, both before and after their transfer from federal status, in violation of the ISDEAA.  As detailed in Maniilaq's claim letters and enclosed calculations for 2009-2011, using available figures on the number of IPA/MOA employees, the average Alaska cost of such employees, and a 15% direct CSC burden on salaries, these underpayments amounted to $31,202 in FY 2009, $31,857 in FY 2010, and $65,203 in FY 2011.

### Indirect Cost Rate Miscalculation

28.     The shortfalls described above were exacerbated by IHS's failure to adjust Maniilaq's indirect cost rate to account for systematic miscalculations on the part of the Department of Interior's National Business Center "NBC"), the cognizant federal agency that calculates Maniilaq's single, government-wide indirect cost rate.  The NBC follows Office of Management and Budget Circular A-87, which states that indirect cost rates are calculated by dividing the indirect cost pool by the total amount of direct cost base funding for all programs Maniilaq carries out, not just IHS programs.

29.     Often, other federal or state funders pay little or no indirect costs.  NBC's inclusion of these programs in the direct cost base inflated the denominator of the rate-making equation, resulting in a lower indirect cost rate.

30.     When determining the amount of indirect costs owed to Maniilaq, IHS employed this "diluted" indirect cost rate, resulting in a systematic underpayment of indirect costs and making it impossible for Maniilaq to carry out IHS programs at the Secretarial level as mandated by the ISDEAA.  The Tenth Circuit held this practice unlawful; the government is responsible for fully funding a contractor's indirect costs.  *Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455 (10th Cir. 1997).  However, rather than adjust the artificially low rate by removing non-paying agencies from the direct cost base of the rate-making equation, IHS in the relevant years employed the diluted NBC indirect cost rate, thus reducing Maniilaq's indirect cost funding.

31.     As detailed in Maniilaq's 2009 claim letter, Maniilaq estimates that exclusion of non-paying agencies from the base would have produced a corrected rate entitling Maniilaq to additional indirect cost funding of $794,084 in FY 2009.

### Indirect Costs on Unpaid Direct CSC

32.     The IHS CSC shortfall reports discussed above break out the shortfalls into underpayments of direct CSC and, in a separate column, indirect CSC.  As discussed above, direct CSC is comprised of expenses directly attributable to a certain program or activity but not captured in either the indirect cost pool or the program amount due under section 106(a)(1).[4]  Direct CSC is part of the direct cost base, and thus generates indirect cost funding through application of the "rate-times-base" method described in paragraph 18 above.  *See* IHS, Indian Health Manual § 6-3.4.E (2007) ("The DCSC, along with other Section 106(a)(1) funds, will be considered part of the recurring base of the award.").

---

[4] *See* 25 U.S.C. § 450j-1(a)(3)(A).

33. Underpayments of direct CSC, therefore, lower Maniilaq's indirect cost funding as well. The IHS shortfall reports, however, do not capture this additional indirect cost shortfall, because the agency added to the direct cost base column only the amount of direct CSC paid, not the amount from the "DCSC Negotiated" column.

34. The unpaid indirect costs on unpaid direct CSC must also be considered as damages. This amount can be determined each year by multiplying the negotiated indirect cost rate by the direct CSC shortfall memorialized in that year's CSC shortfall report.

Expectancy Damages: Lost Third-Party Revenues

35. These described breaches of contract also damaged Maniilaq through the loss of third-party revenues. Maniilaq generates significant revenue from billing Medicaid, Medicare, and private insurance for health care services provided with IHS funding under Maniilaq's ISDEAA agreements.

36. As a result of IHS's underfunding of CSC in each year, Maniilaq was forced to divert program funds to cover fixed administrative and overhead expenses, reducing the amounts available to provide health care services, some of which could have been billed to third parties. Maniilaq's third-party collection rate for each year can be determined by dividing the amounts collected—which can be determined from the annual audit—by the total IHS program funding for that year. For example, in FY 2011, for every dollar of IHS funding spent, Maniilaq recovered 59 cents in third-party billings—revenue used to provide further health care services to members of Maniilaq's constituent tribes and other eligible beneficiaries. The amount of lost third-party revenues for each year can be estimated by multiplying that year's collection rate by the CSC shortfall. Diversion of program money, and the resulting loss of third-party revenue, was a

foreseeable consequence of the CSC underpayments. IHS has long known that CSC shortfalls force tribes to divert program funds.[5]

## CAUSE OF ACTION – Breach of Contract

37. All prior allegations are adopted by reference.

38. Maniilaq's contracts incorporate the statutory duty to fully fund CSC. 25 U.S.C. § 450j-1(a) & (g); *see also, e.g.*, 2006 Annual Funding Agreement § 4(b). This duty was affirmed by the Supreme Court in *Ramah,* which other courts have followed. Despite this statutory and contractual duty, during the years in question, the IHS failed to provide the full funding due under the Contract.

39. Instead, the IHS paid significantly less than its full CSC requirement in fiscal years 2006-2011, as acknowledged in IHS's own shortfall reports. In doing so, the IHS violated the ISDEAA's requirement of full payment from available appropriations without regard to total appropriations or any congressionally imposed aggregate caps, as affirmed by the Supreme Court in *Ramah*, and breached its agreements with Maniilaq, which incorporate the full-funding requirement of section 106(a).

### Claim 1: FY 2006

40. As indicated in the IHS's own shortfall report, Maniilaq's CSC requirement for 2006 was $12,234,254, yet the IHS paid only $9,961,983. Therefore, Maniilaq asserts a claim under the ISDEAA and the Contract in the amount of **$2,272,271**, plus indirect costs on unpaid direct CSC, plus expectancy and other damages in an amount to be established by the evidence.

---

[5] *See, e.g.*, U.S. Gov't Accountability Office, GAO-99-150, Indian Self-Determination Act: Shortfalls in Indian Contract Support Costs Need to Be Addressed 40-41 (1999) (describing use of medical program resources to cover CSC shortfalls).

<u>Claim 2: FY 2007</u>

41.  As indicated in the IHS's own shortfall report, Maniilaq's CSC requirement for 2007 was $15,088,255, yet the IHS paid only $10,028,210. Therefore, Maniilaq asserts a claim under the ISDEAA and the Contract in the amount of **$5,060,045**, plus indirect costs on unpaid direct CSC, plus expectancy and other damages in an amount to be established by the evidence.

<u>Claim 3: FY 2008</u>

42.  As indicated in the IHS's own shortfall report, Maniilaq's CSC requirement for 2008 was $15,125,547, yet the IHS paid only $9,935,947. Therefore, Maniilaq asserts a claim under the ISDEAA and the Contract in the amount of **$5,189,600**, plus indirect costs on unpaid direct CSC, plus expectancy and other damages in an amount to be established by the evidence.

<u>Claim 4: FY 2009</u>

43.  As indicated in the IHS's own shortfall report, Maniilaq's CSC requirement for 2009 was $15,417,689, yet the IHS paid only $10,264,942. Therefore, Maniilaq asserts a claim under the ISDEAA and the Contract in the amount of $5,152,747, plus additional damages as specified in the 2009 claim letter: $24,286 for indirect costs on unpaid direct CSC, $31,202 for unpaid direct CSC on IPA/MOA conversions, $794,084 for indirect cost rate miscalculation, and $2,352,895 for lost third-party revenue, for a total FY 2009 claim of **$8,355,214**.

<u>Claim 5: FY 2010</u>

44.  As indicated in the IHS's own shortfall report, Maniilaq's CSC requirement for 2010 was $15,919,131, yet the IHS paid only $13,306,632. Therefore, Maniilaq asserts a claim under the ISDEAA and the Contract in the amount of $2,612,499, plus additional damages as specified in the 2010 claim letter: $16,203 for indirect costs on unpaid direct CSC, $31,857 for unpaid direct CSC on IPA/MOA conversions, and $1,547,630 for lost third-party revenue, for a total FY 2010 claim of **$4,208,189**.

Claim 6: FY 2011

45. As indicated in the IHS's own shortfall report, Maniilaq's CSC requirement for 2011 was $15,930,466, yet the IHS paid only $13,357,383. Therefore, Maniilaq asserts a claim under the ISDEAA and the Contract in the amount of $2,573,083, plus additional damages as specified in the 2011 claim letter: $16,446 for indirect costs on unpaid direct CSC, $65,203 for unpaid direct CSC on IPA/MOA conversions, and $1,554,324 for lost third-party revenue, for a total FY 2011 claim of **$4,209,056**.

## PRAYER FOR RELIEF

46. The Plaintiff therefore requests that this Court:

   A. Award Maniilaq **$29,294,375** in damages, as detailed in paragraphs 40-45 above and summarized as follows:

| FY | Amount ($) |
|---|---|
| 2006 | 2,272,271 |
| 2007 | 5,060,045 |
| 2008 | 5,189,600 |
| 2009 | 8,355,214 |
| 2010 | 4,208,189 |
| 2011 | 4,209,056 |
| **Total** | **29,294,375** |

   B. Award damages for indirect costs on unpaid direct CSC in each year in an amount to be determined by the proof;

   C. Award expectancy damages for lost third-party revenues resulting from the CSC underpayments, in an amount to be determined by the proof;

   D. Award such other damages as may be proven in this action;

   E. Order the payment of interest on these claims pursuant to the CDA, 41 U.S.C. § 7109, and the Prompt Payment Act, Chapter 39 of Title 31, United States Code;

    F.  Award Maniilaq its attorney fees and expenses pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 and 25 U.S.C. § 450m-1(c), and other applicable law; and

    G.  Grant Maniilaq such other and further relief as the Court deems appropriate.

Respectfully Submitted,

  s/ Caroline Mayhew
Caroline Mayhew (DC Bar No. 1011766)
Hobbs, Straus, Dean, & Walker LLP
2120 L St. NW, Suite 700
Washington, DC  20037
202-822-8282 (Tel.)
202-296-8834 (Fax)


Geoffrey D. Strommer, *pro hac vice pending*
Stephen D. Osborne, *pro hac vice pending*
Hobbs, Straus, Dean & Walker, LLP
806 SW Broadway, Suite 900
Portland, OR 97205
503-242-1745 (Tel.)
503-242-1072 (Fax)


Attorneys for the Maniilaq Association.

DATED: April 3, 2013.